MONROE, Judge.
The parties married in February 1992, and divorced in September 1995. There was one child born of the marriage, a son born in 1992. Although the parties’ divorce judgment' is not contained in the record, the parties’ testimony indicates that the mother was awarded custody of the minor child, with visitation rights vested in the father, and the father was ordered to pay child support.
In August 1996, the father quit exercising his visitation rights, and he also quit paying child support. In February 1998, the mother married Lonnie Cox, who has custody of his two daughters, ages 13 and 14. The mother testified that in May 1998, she, her husband, and their children decided to move to Texas because her husband had a job lined up as the manager of a Busy Bee restaurant and because her husband had family who lived in the area of Texas where they planned to move. The maternal grandmother testified that they moved because the mother was running from the maternal grandmother and because the mother’s husband was making *536 good on his threat that he would take the mother and the minor child far away from the maternal grandmother.
In May 1998, the father, who had not visited with the minor child or even paid child support since August 1996, petitioned the court to modify the custody portion of the parties’ divorce decree. The petition stated that the father had been contacted by the maternal grandmother, who told him that the mother planned to move to Texas with the parties’ minor child. The father stated that he had remarried and that he could provide a stable environment for the minor child and that he feared for the safety and well-being of the parties’ minor child and felt that it would be in the child’s best interest for custody to be removed from the mother and vested in the father. The father also requested temporary legal and physical custody of the minor child, pending a final hearing. To his petition to modify, the father attached his affidavit and an affidavit executed by the maternal grandmother.
On June 25, 1998, the trial court issued an ex parte order placing custody of the minor child with the father, pending the final hearing in this matter. The trial court noted in its order that the mother was not present at the hearing and that service had not been perfected on the mother. Thereafter, the father went to Texas to get the child and bring him back to Alabama.
In July 1998, the maternal grandmother filed a petition to intervene, seeking grand-parental visitation rights. The grandmother alleged that although she has been an integral part of the minor child’s life, the father, who did not exercise his visitation rights or attempt to be involved with rearing the minor child for almost two years and who did not pay child support during that two-year period, had refused to allow her visitation with the minor child since he had gained temporary custody. The trial court issued a pendente lite order, awarding the maternal grandmother visitation on alternating weekends and awarding the mother reasonable visitation, in state, with notice to the father as to when the mother would be in the state.
Thereafter, the mother filed an answer, a petition to have the father found in contempt, a motion to set aside the June 25, 1998, ex parte order, and a counterclaim.
After a hearing in February 1999, the trial court issued an order, finding that a change in the custody of the child would materially promote the best interests of the child and that any negative impact would be outweighed by the benefits of a change in custody. The trial court awarded the mother visitation rights and ordered her to pay $134 per month in child support, to be credited against the father’s child-support arrearage of $5,176.
The mother filed a motion to alter, amend, or vacate the order, which was denied. The mother appeals, contending that the father failed to meet his burden under Ex parte McLendon, 455 So.2d 863 (Ala.1984). We agree.
Under the McLendon standard, the father “must show not only that [he] is fit, but also that the change of custody ‘materially promotes’ the child’s best interest and welfare.” Ex parte McLendon, 455 So.2d at 866. The father must also “show that the child’s interests are promoted by the change, i.e., that [he] produce evidence to overcome the ‘inherently disruptive effect caused by uprooting the child.’ ” Ex parte McLendon, 455 So.2d at 866.
The record indicates the following: The father has remarried, his present wife has custody of her four-year-old son, and they have a newborn. The father and his family reside in a three-bedroom mobile home. The father had paid no child support since August 1996, and had no contact with the minor child involved in this present case between August 1996 and June 1998, when he obtained the ex parte order. The father admitted that he had no personal knowledge of most of the statements he made in the affidavit he used to obtain *537 the ex parte order — that he had relied upon what the maternal grandmother told him. At the hearing, the father testified:
“Q. So the bottom line is, all this really came about from [the maternal grandmother], didn’t it?
“A. Yes, sir.
“Q. [The maternal grandmother] came [to you] because she needed you to stop the child from being moved to Texas?
“A. Yes, sir.
“Q. That is the whole essence of this—
“A. And I saw my chance to take back what was rightfully mine which was a relationship with my own son.
“Q. But for a period of a year and a half or two years, it didn’t bother you, did it?
“A. Yes, sir, it did.
“Q. You weren’t around any of those times or supporting him to learn how to ride a bicycle, were you?
“A. I couldn’t find him.
“Q. You couldn’t find him?
“A. No, sir.
“Q. Where did y’all live in relationship to each other for the year and a half that you didn’t see him?
“A. For the [last] three or four months, they lived about a stone’s throw away from my house.
“Q. You could actually see the house?
“A. Yes, sir, I could.
“Q. Could you even see your son walking around out in the yard out there then?
“A. Yes, sir.
“Q. Did you ever go down there and talk to him?
“A. No.
[[Image here]]
“Q. So really your love for this child just started back about last summer when your former wife moved to Texas; is that what we’re saying?
“A. Yes, sir.
“Q. But all those times she was there changing the diapers and trying to scrape up enough money to buy food and raise this child, you really — you weren’t contributing during that period of time, were you?
“A. No, sir.
“Q. Well, then go ahead and explain to me and the court why this is an unfit mother.
“A. It is explained in the affidavit.
“Q. You’ve admitted the affidavit has some lies in it.
“A. It has some untruths, yes, sir.”
It is undisputed that the maternal grandmother was a very active participant in the minor child’s life. The mother was only 17 years old, a junior in high school, when this minor child was born. The maternal grandmother kept the minor child while the mother completed her senior year in high school. The maternal grandmother helped the mother financially and would make sure that the child had everything he needed — even medical care.
The maternal grandmother had a great deal of influence over the mother’s actions regarding the minor child, until the mother remarried in February 1998. At that time, the mother began to rely upon her husband and allowed him to set the standards — if you act up at school, you are grounded; if you are sick, you stay home in bed; etc. This caused a great deal of friction between the mother and the maternal grandmother because the standards set by the husband sometimes interfered with the minor child’s being able to visit with the maternal grandmother, and in the conflicts the mother would side with her husband. The maternal grandmother testified that she was scared of the influence that the mother’s husband had over the mother.
The maternal grandmother admitted that she advised the mother not to seek *538 the child support because she was afraid that the father would want to exercise his visitation rights. The maternal grandmother also admitted that although she had not seen the father since the divorce in 1995, she went to the father after the mother told her one Sunday night that she and her family were moving to Texas on the following Thursday. The mother testified that after she told the maternal grandmother on Sunday that they were moving, the maternal grandmother took the minor child on Monday and the mother had to get the police involved to get the child back. The maternal grandmother testified that the mother needs her help and there needs to be a change of custody because the mother will not have the maternal grandmother’s help in Texas. The maternal grandmother also testified that she was scared for the mother and the minor child because, she said, the husband has a volatile temper.
The mother denied that her husband had a volatile temper. She admitted that when they first moved to Texas, they stayed in her husband’s stepmother’s one-bedroom apartment while the stepmother was out of town. The mother testified that both she and her husband are employed full-time; that they live in a three-bedroom, two-bath mobile home; and that they are financially able to provide for the minor child. The mother admitted that the minor child was overweight and could not tie his shoes or ride a bicycle when the father got him in June 1998. However, the mother testified that he had begun to lose weight after the move to Texas because he did not have so many people feeding him all the time — the maternal grandmother, the maternal great-grandmother, and other relatives. The mother testified that she was working with the child on tying his shoes and riding a bicycle, but that he had not quite mastered those skills when the father gained temporary custody of the child. The mother admitted that the child was due for an immunization when they moved in May 1998, and that she had not taken him to be immunized before the father got the child. The mother also admitted that the child struggled in kindergarten for four-year-olds, but that he repeated K-4 and after-wards he had had no problems in school.
It would appear that the only change of any significance was the mother’s move to Texas. “A change in the custodial parent’s place of residence does not, of necessity, justify a change in child custody even where the relocation by the custodial parent is outside of the United States; however, such change is a factor to be considered.” Vail v. Vail, 532 So.2d 639, 641 (Ala.Civ.App.1988).
After reviewing the record, we conclude that the father failed to meet his burden under McLendon. Thus, the judgment of the trial court is reversed and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and YATES, CRAWLEY, and THOMPSON, JJ„ concur.